The defendants, with Peck Locklear, were indicted in the court below for the murder of Philip Barton. At the trial and after the evidence was concluded, the State consented to a verdict of not guilty as to Peck Locklear, the court having intimated that there was no evidence against him, and the other defendants were convicted of manslaughter.
It appears from the case that on Christmas day, 1902, the defendants John Hall, Pink Woods, and Peck Locklear went to the house of Elizabeth Barton, where Nep Barton, her son, lived. No one was there at the time but Kitty Barton and a small boy named Porter Barton. They left the house after a short stay, and the defendants John Hall and Peck Locklear returned later in the day, John Hall having with him a gun, and found Rual Barton and Nep Barton at the house. They remained at the house a short while and then left, and late in the afternoon of the same day the defendants and Peck Locklear were again at the Barton place. While they were there Philip Barton was killed. There was some discrepancy in the evidence as to whether the defendant Pink Woods was with Hall and Locklear when they went to the house the second time, but in the view we take of the case it is immaterial whether he was with them or not.
The evidence is very conflicting as to the material facts of the case, and the exceptions of the defendants, we think, can be best understood by stating the contentions of the State and defendants (1096) there having been evidence to support each of said contentions.
The State insisted that upon the evidence the defendants, John Hall, Pink Woods, and Peck Locklear, had gone to the Barton house twice before the homicide occurred, and that on the occasion of the second visit John Hall had an altercation with Rual and Nep Barton. That John Hall jumped into the door of the house with a gun in his hands and said to Rual Barton, "I hear you accuse me of selling your dog, and anybody who said so is a liar"; that during this visit Rual Barton snatched the gun from the defendant John Hall, and the said defendants left the premises, threatening at the time to get a crowd and come back and retake the gun by force. Shortly afterwards, but late in the afternoon, the defendants Hall and Woods and Peck Locklear, accompanied by Ned Chavis and Enoch Chavis and one Utley Locklear, returned and made an assault upon Rual Barton, who was trying to *Page 774 
drive the defendants away. In the fight which ensued the defendant Hall snatched the gun from Rual Barton, all of the defendants taking part in the fight, and immediately upon Hall's gaining possession of the gun, he fired the same and shot the deceased, Philip Barton, who was standing about five or six feet behind Nep Barton and Rual Barton, and who had not engaged in the fight.
The defendants contended that on the said day John Hall and Pink Woods and Peck Locklear, being intimate with and on friendly terms with the Barton family, visited the home of the Bartons for the purpose of paying attention to two of the Barton girls, who were granddaughters of Elizabeth Barton, and who at the time made their home with her; that just prior to their first visit the defendants Hall and Woods, and Peck Locklear, met Rhoda Barton near her home, and the defendant Hall made an engagement to meet her later in the day, after which they went on to the home of Elizabeth Barton, and there saw Kitty Barton alone, when the defendant Woods made an (1097) engagement to meet her later in the day; that having been disappointed in seeing the girls in accordance with their engagements the defendant Hall and Peck Locklear went to the home of Elizabeth Barton, on the occasion of the second visit, expecting to see the girls and find out the cause of the failure to keep the engagements, when they met Rual and Nep Barton, both of whom were drinking and boisterous. Nep Barton cursed the defendant Hall, and Rual Barton took from the defendant Hall his gun, and rather than have any difficulty the defendant Hall, and Peck Locklear, left; all this taking place prior to the visit during which the homicide occurred; that being joined by defendant Woods, who was waiting for them, they all went home; that at the home of their father the defendants Hall and Woods met the two Chavis boys, who were their cousins, and after having eaten dinner were joined by them, and all started to the home of one John Archie Locklear. On the way they were joined by Peck Locklear. In going to John Archie Locklear's they took the nearest road, which leads by the house of Elizabeth Barton, the road and her yard adjoining and there being no fence between them. Just before getting to the Bartons, they were met and joined by Utley Locklear, who went along with them on the way to John Archie Locklear's, and just as they approached the house of Elizabeth Barton, Rual Barton and Nep Barton, Rual armed with a gun and Nep with a knife, rushed out to meet the defendants — Philip Barton, the deceased, following them. Rual Barton, when the defendants were only a step or so from him, raised the gun and began threatening to shoot. Nep rushed at the defendants, and Rual telling him to get out of the way, started to shoot, *Page 775 
when the defendants advanced upon him to prevent his shooting and to protect themselves. Rual Barton tried to strike with the gun, and as he struck the defendant Chavis the gun fired, (1098) killing the deceased, who was at the time about five or six steps behind him. While Rual was scuffling and trying to get the gun in position to shoot, Nep Barton was using his knife, and one of the defendants (Chavis) exhibited at the trial long gashes across his back, which he claimed were made by Nep Barton during the scuffle. Nep, who was a witness for the State, denied having the knife, and all of the Bartons testified that Nep did not cut the defendant. The defendants further contended that they did not succeed in getting the gun away from Rual Barton until after it had been fired and was broken while Rual Barton was striking at the defendants with it. The gun, according to all the testimony, had but one barrel.
The State insisted that the defendants were guilty of murder in the first degree, and the defendants, on the other hand, contended that no one of them discharged the gun, but that it was discharged in the hands of Rual Barton while he was assaulting the defendants; that the Bartons were the aggressors and the defendants acted strictly in self-defense.
At the trial the defendants proposed to ask Peck Locklear, one of the defendants, who was introduced as a witness, what was the purpose of the defendants in going to the Barton house, which was excluded on objection by the State. They also proposed to ask defendants' witness, Oakley McMillan, the following question: "What was said between Kitty and Nep Barton as to why the boys were there?" which was also excluded by the court. The defendants proposed to ask Rual Barton, a witness for the State, the following question: "A good many things are slipping from your memory today in reference to this transaction, are they not?" This was stated, at the time the question was asked, to be for the purpose of testing the witness's recollection and ascertaining whether or not he claimed to recollect all about what took place at the time the homicide occurred and as to what took place at the coroner's inquest. The witness (1099) was the uncle of the deceased, and, according to the contention of the defendants, it was he who had the gun in his possession at the time it was discharged. The defendants further claimed, and several witnesses testified, that the witness was very much intoxicated on the day of the homicide. In addition to this, to a number of questions previously asked him, the witness had replied, "I don't recollect," "Has slipped my recollection," etc. Further, a number of witnesses testified during the trial to contradictory statements made to *Page 776 
them by this witness, to a great many of whom he and Nep Barton had stated that the deceased was killed by Ned Chavis with a pistol, in consequence of which it was shown that Ned Chavis was arrested first by the sheriff. It was further shown by the coroner that this witness had stated to him that the gun was not loaded when the difficulty took place; that he had taken the shell out of the gun (which was breechloading); and it was further shown by the coroner that this witness gave to him some shells, one of which he said he had taken out of the gun just prior to the difficulty, and yet none of the shells would fit the gun.
In addressing the jury, and while discussing the evidence of the Bartons, who had been introduced as witnesses for the State, counsel for defendants used the following language: "If you convict these defendants you must do it on the testimony of the Bartons, and these people, the Bartons, have charged two other men with being guilty, along with these defendants, of the murder of Philip Barton, namely, Utley Locklear and Peck Locklear. Utley Locklear was discharged by the coroner's jury, and the State has, by consenting to a verdict of not guilty, as to Peck Locklear, admitted that the Bartons were wrong as to Peck." These remarks were not objected to by the solicitor, so far as the record shows, but the court of its own motion interrupted counsel and refused to permit him to make this argument (1100) and told the jury not to consider it. Defendants excepted.
The State had endeavored to impeach Utley Locklear, who was a witness for the defendants, by asking him if he had not been charged with being a party to the homicide. It was in evidence that Utley Locklear had been charged with the homicide and was discharged after investigation by the coroner's jury, and it was also in evidence that the Bartons had made the charge against him. The Bartons were the only witnesses for the State as to the occurrence at the Barton house, except Bemus Blue, who was a member of the Barton family.
The same counsel in addressing the jury used this language: "The Bartons have charged Peck Locklear with being responsible for this crime. The bill against him was returned by the grand jury, and the Bartons were the people who brought the charge against Peck, as well as being the main witnesses." The court again interrupted counsel and refused to permit him to make this argument and also instructed the jury not to consider it. Defendants excepted.
At the close of the evidence the defendants requested the court to give the following instructions, among others, to the jury: "Even *Page 777 
though the jury shall find that defendants were engaged in an assault or some other unlawful act, if the jury shall find that the gun was discharged by Rual Barton, or that the gun was accidentally discharged while in the hands of Rual Barton, resulting in the death of Philip Barton, still the defendants cannot be held criminally responsible for the homicide, and in this case the defendants cannot be found guilty of either murder in the first degree or murder in the second degree or manslaughter." This instruction was refused, and the defendants excepted.
The only part of the judge's charge which it is necessary to set forth is as follows: "If you shall further find that John Hall went upon the premises of the Bartons, and that Pink Woods (1101) and the other defendants accompanied him, after he and they had been forbidden so to do, with the purpose and intent on Hall's part to kill the Bartons, or to do them or either one of them serious bodily harm, or with the purpose of forcibly taking the gun away from Rual Barton at all hazards, although it might involve the killing of or the doing of great bodily harm to the Bartons, or some one of them, and if the said Pink Woods knew the said purpose of John Hall, and if, with the intent to aid and abet the said John Hall in this purpose, he assaulted Rual Barton and aided John Hall to wrench the gun from Rual Barton's hands, and that John Hall then wilfully and because of such malice and in pursuance of such purpose shot Philip Barton, then Pink Woods would be guilty of murder in the second degree." To this charge the defendants excepted.
The court further instructed the jury as follows: "If you shall find that John Hall had express malice against the Bartons and went there with the purpose of killing the Bartons or either one of them, or doing them or either one of them serious bodily harm, or with the purpose of forcibly taking the gun away from the Bartons at all hazards, although it might involve the killing of them or some one of them, or of doing serious bodily harm to them or some one of them, and that the other defendants, Pink Woods, Ed. Chavis, and Enoch Chavis, knew of this purpose, and accompanied Hall to aid him in such purpose, and if he entered upon the premises after being forbidden so to do, and in furtherance of that purpose assaulted Rual Barton, and threw him to the ground for the purpose of wrenching the gun forcibly from him, and if, in the effort to wrench the gun from Rual Barton's hands, the gun was discharged, killing Philip Barton, then all the defendants, or such of them as you shall find knew of this purpose and in pursuance thereof aided and abetted, as stated *Page 778 
above, would be guilty of manslaughter." Defendants excepted. Verdict for manslaughter as to all the defendants except Locklear. (1102) Defendants appealed from the judgment pronounced.
We do not see why the question proposed to be put to the witness, Peck Locklear, was not competent, especially in view of the particular instruction given to the jury in regard to manslaughter, of which crime the defendants were convicted. The guilt of the defendants was by that charge made to depend, at least in some measure, upon their purpose in going to the house of the Bartons, for the court told the jury that if John Hall had express malice against the Bartons and went to their house for the purpose of killing them or any one of them, or to do them or any one of them serious bodily harm, or with the purpose of forcibly taking the gun from them at all hazards or without regard to consequences, and if the jury also found that the other defendants knew of this purpose, and accompanied John Hall in order to aid and abet him in executing his unlawful design, and if, in furtherance of that design, Rual Barton was assaulted, and in the effort to wrest the gun from him it was discharged and Philip Barton was killed, the defendants, or such of the defendants as knew of this purpose of John Hall and were present aiding and abetting him, would be guilty of manslaughter. It appears most clearly, therefore, that the purpose of the defendants in going to the house of the Bartons was made one of the essential facts of the case to be established by the State, and, evidence having been introduced which tended to prove this fact, the defendants were entitled to be heard in contradiction of it. How could the absence of an unlawful intent or the existence of a lawful one be better shown than by the testimony of one of the parties charged with having entertained that purpose? Whether the (1103) witness should be believed is a question solely for the consideration of the jury. This Court has often ruled that when a person is charged with a fraudulent intent it is competent for him to show by his own testimony that, at the time of the transaction, he had no such intent, and so may any person charged with an unlawful intent in a criminal case be heard by his own testimony in order to disprove or rebut the charge made against him, at least when the intent becomes essential in determining his guilt. We are not informed upon what ground or for what reason the question was objected *Page 779 
to by the State. There may have been some good reason for the objection and the ruling, but it does not appear in the record, by which, of course, we are bound. There is nothing, therefore, to take the ruling out of the general, if not universal, principle that both parties must always be heard, provided they offer competent and relevant testimony.
It was suggested by the Attorney-General that the guilt of the defendants depended not so much upon their purpose in going to the Barton house as upon their acts and conduct after they entered upon the premises, as they were convicted of manslaughter and not of a higher felony. If the only evidence in the case had been that of the State, there might be some force in this suggestion; but it was not by any means all the evidence, as the defendants introduced testimony tending to show that they were walking in the public road, which passed the house of the Bartons, in a peaceful manner and for a lawful purpose, they being at that time on their way to John Archie Locklear's, and as they were passing the Barton house they were violently set upon by the Bartons, one of whom at least was armed; that the Bartons were the aggressors and the defendants acted strictly in self-defense. But even if the consideration of this part of the case should, as a matter of law, have been confined to what occurred at the house, it does not follow that the excluded question was incompetent, because (1104) the court did not in fact so confine and limit the inquiry, but, on the contrary, made the guilt of the defendants, as we have said, turn in part upon the intent with which they accompanied John Hall to the Barton house. But there is another reason why the evidence should have been admitted. The theory of the State was that the defendants went to the house of the Bartons to attack them, and the defendants contended that they had no such purpose, but were on their way to John Archie Locklear's when they were violently assaulted by the Bartons, and that all they did at the house was strictly in self-defense; and, as we have said, whether the contention of the State or that of the defendants was the right one was a matter solely for the jury to find. The defendants were certainly entitled to show, as one of the facts tending to sustain their contention, that they went to the house for a lawful purpose, for if they went there for an unlawful purpose, as the State insisted they did, it would tend in some degree at least to weaken, if it would not destroy, their plea of self-defense. It was competent also to prove the fact, as some evidence tending to show how the fight started, whether the Bartons or the defendants were the aggressors, or whether or not the defendants entered into the fight willingly. If defendants were on their way to *Page 780 
Locklear's, and, when they reached the house of the Bartons, they were attacked without having done anything to bring on the fight, and they afterwards acted strictly in self-defense, they were entitled to an acquittal. Would not the jury be more apt to conclude that a man with hostile purpose was the aggressor in a fight than that one with a peaceful purpose was? The particular error in the ruling was that the court deprived the defendants of an opportunity to show that their purpose was a lawful one, and in charging the jury that, in passing upon the guilt of the defendants, they should consider and find what that purpose was, as if it bore directly upon the issue (1105) joined between the State and the defendants. The impression made on the jury by the ruling of the court upon the evidence, when considered in connection with the charge, cannot well be determined, and the prisoner may have been seriously prejudiced thereby.
The error of the court in excluding this question is sufficient to entitle the defendants to a new trial, but we deem it best, under the facts and circumstances of this case, to make some comment upon the other exceptions, as the same questions thereby presented, or at least some of them, may be raised at the next trial.
The exception to the ruling of the court in excluding the question put to the witness Owen McMillan is not very clearly stated in the record. It appears only that the defendants were not permitted to prove what was said between Kitty and Nep Barton "as to why the boys were there," that is, at the house. It is not shown what the witness would have said in answer to the question, but we take it that he would have testified that Kitty and Nep Barton said in that conversation that they were there for some lawful purpose. It is best always and in order to a perfect understanding of an exception based upon the rejection of evidence, that the particular nature of the evidence to be elicited should clearly appear. If we are correct in our inference as to what the witness would have said, it seems that the question was competent for the purpose of contradicting the witness Nep Barton. It could not have been competent as substantive testimony.
We can see no valid objection to the question proposed to be asked the witness Rual Barton, who testified in behalf of the State. It did not tend, perhaps, to prove very much in the case, one way or the other, but from the manner in which the exception is stated in the record, we have been able to discover no sufficient reason for excluding the question, as it was some evidence, though very slight, tending (1106) to impair the witness's credibility. It is competent to prove *Page 781 
that a witness's memory has been weakened, and it can make no difference whether the impairment of memory is proved by the witness himself or by some one else, or how slight the evidence may be. It would be competent to ask a witness if he recollected all of the facts and circumstances connected with a particular transaction, or whether he had forgotten some of them, and we can perceive no substantial difference between that kind of evidence and that which was proposed to be elicited in this case.
Passing to the next exception, we have said at this term that it is the duty of the court to stop counsel when they discuss matters of which there is no evidence, or which are not proper subjects of comment; but within the proper limits of debate, counsel should be permitted to discuss any fact of which there is evidence, and which is relevant to the issue. We are of the opinion, therefore, that the discharge of Utley Locklear or the failure of the State to prosecute him, when he had been charged by the Bartons as being one of the guilty parties, and the other fact that the State after a full investigation at the trial of this case had consented to a verdict of not guilty as to Peck Locklear, though he had been similarly accused by the Bartons, were not improper subjects of comment.
The court was clearly right in refusing the defendants' prayer for instruction. It did not state a correct principle of law, and especially is it erroneous when considered with reference to the facts of the case. If the defendants went to the house of the Bartons for the purpose of recovering the gun "at all hazards," and to kill if necessary to accomplish their purpose, they were guilty at least of manslaughter. This is the way in which the able and learned judge who presided at the trial submitted the case to the jury in his charge, and the instruction we think was clearly right. A case directly in point isReg. v. Skeed, 4 F., 931. In Reg. v. Archer, 1 F. (1107) and F., 351, it appeared that the defendant pursued the deceased for the purpose of regaining possession of a loaded gun which the deceased had theretofore taken from the defendant's house and carried away with him, and during the struggle for the gun between the defendant and deceased, it was discharged and the deceased was killed; the Court held that the defendant was guilty of manslaughter. 1 McLain Cr. Law, sec. 347. The same doctrine is laid down in S. v. Vines, 93 N.C. 493. It is the unlawful purpose, in the prosecution of which the homicide is committed, that makes the killing manslaughter.
The defendants' exception to the charge of the court cannot be sustained. We have examined the charge very carefully and can find *Page 782 
no error in it, but if there had been error it should have been specifically pointed out, and the defendants will not be allowed to take advantage of it by a general objection to the entire charge, or to any part of the charge, which contains several distinct propositions, some of which are correct, or at least correct as to one or more of the defendants, although one or more of the principles laid down may be erroneous.
There must be a new trial because of the errors committed by the court in the respects pointed out.
New trial.
Cited: S. v. White, 138 N.C. 715; S. v. Durham, 141 N.C. 746; Richv. Electric Co., 152 N.C. 696; S. v. Bowman, ib., 820; S. v. Price,158 N.C. 648; S. v. Hand, 170 N.C. 706; Hauser v. Furniture Co.,174 N.C. 468.