The defendants, Jesse A. Price and Robert E. Price, were indicted in the court below for the murder of Lester Rushing. The evidence is voluminous and there are many exceptions.
Thomas Rushing, a witness for the State, testified: That he and his brother Lester went to Lester's house about dark, for the purpose of getting feed for Lester's mule. Lester Rushing kept his mule in Jesse Price's barn. The barn was east of Jesse's house about 20 yards, and was situated about north of Lester's house. While he and the deceased were in the latter's house, some one shot five times at Jesse's house. Sounded like pistol shots. They stayed in Lester's house about five minutes, and walked up to Jesse's barn with the mule and feed. (643) After feeding the mule, they left, going towards Lester's house, when Jesse shot both of them in the back, and one shot struck the deceased in the right side of his head. He saw the defendant Jesse shoot. Jesse and Robert, the defendants, went to shooting pistols. Jesse Price shot a gun. He (the witness) was not armed, but his brother had a pistol on his person. Lester did not shoot and did not pull out his pistol. When he was shot, Lester ran a few steps and fell. He was shortly carried to his house, and died three or four hours afterwards. He went to Lester's house, and saw a pistol lying on the table. He then went about 60 yards to where Jesse and Robert were, and shot at Jesse one time. He went back and got a gun and started again. When he heard Lester groaning in the field, he laid the gun down in Lester's door. Lester Rushing was keeping a bachelor's house; witness *Page 539 
lived with his mother, some distance from Lester's house; he knew that Lester and Jesse Price had had a little trouble before this; that the feeling of his brother Lester towards Jesse Price had existed about three weeks. His brother Lester went to Monroe Saturday evening, and returned Monday evening with his Winchester rifle. He loaned Lester his buggy to go to Monroe; Lester did not have a Winchester rifle before he went, but he had one when he got back. He went over to his brother Willie's to get Lester's shotgun. Lester had a double-barrel shotgun there that night, and two pistols and a Winchester rifle. Both pistols were Lester's. Witness testified that he did not know whether Lester had any firearms before he went to Monroe or not. When witness met the Timmon boys and Richardson, immediately after the shooting, he had the shotgun in his hand. When Jesse Price fired, the shot killed Lester and also hit him. He supposed that Jesse was using a breech-loader with a No. 1 shot. He and his brother were hit in the back, and one shot struck his brother in the right side of his head. Some of the shots are in the witness yet — three or four shots in his back now. He exhibited his coat and showed where the shot holes were in the coat and in his brother's suspenders. He also exhibited his brother's shirt, and showed where the shot had entered, stating that they were shot in the back, and there were holes in the back of the shirt. He also stated that they were walking down the path when they were (644) shot, his brother being on his side, and that he did not see either of the defendants before the gun was fired. There were thirteen shot holes in his brother's coat. Both Jesse and Robert were shooting pistols, and they shot three times after he did. Jesse and Robert were standing together at the corner of the wagon and they both fired from that place, that is, standing behind the wagon, or at the corner of the wagon. Robert did not tell him not to come and raise any fuss.
Dr. J. B. Eubanks testified: That he examined the body of the deceased; he found thirteen bruised spots, which appeared to be shot holes, on the right side of the backbone, and one in the right side of the head. The range of the shots was at an angle. Two shots were taken out from under the skin; they went straight towards the backbone. The range of the shot in the temple was inward and outward. Found only one shot in the temple. The shot in the back seemed to be rather a glancing shot; the shot that entered the temple was the one that caused death. It was a small shot. He undertook to probe the shot holes, and found that they were only bruises. Only two shots penetrated the skin. They went in about one-eighth of an inch, and he pushed them out; they were very small shot, and would have to hit some vital part in order to hurt. In order to satisfy himself that the shot *Page 540 
did not penetrate the skin, he cut out pieces of the bruised skin and washed it, and found no holes in the skin at all.
J. W. Terrell, Jr., testified: He was at Jesse Price's house in August; Jesse told him he had to get his brother Zeke's Winchester rifle to practice shooting, as he expected trouble with Lester Rushing that fall; he told his father about this when he came home.
J. W. Terrell, Sr., testified: That the young man came home one evening and talked a little while, and said: "Pa, let me see you a little bit." He then went out in the yard and the son said: "Pa, I except Jesse Price and Lester Rushing will have trouble." That Jesse had told him he and Lester would have trouble, and he was going to get his brother Zeke's rifle and practice up.
Cletes Martin testified: That Robert Price came to his house on 12 October, and said that Zeke Price said to let him have his rifle; (645) that Jesse had some 32-caliber cartridges, but that the rifle carried No. 38 cartridges.
James Martin testified: That Jesse Price sent a box of No. 32 cartridges by him to Marshville to be exchanged for No. 38 cartridges, but that he could not secure the 38 cartridges, and returned the 32 cartridges to the merchant and carried Jesse Price 85 cents.
This closed the State's testimony in chief.
Jesse A. Price testified in his own behalf as follows: That the deceased was living and farming with him during the year 1910; deceased traded on halves and then got dissatisfied, and said he wanted a mule of his own. He went to Marshville and got one, and the witness rented him his land. He never had any trouble with the deceased until three weeks before the homicide; they were entirely friendly up to that time. At this time they had a dispute over a sack of flour and some molasses; the deceased wanted to sell him his crop, but witness could not give him what he asked for it; he told him that he was not able to buy it. The deceased said: "I want you to come down at 12 o'clock, and we will count everything I owe you." He was afraid, from the way the deceased had been talking, that he would fuss with him, and he sent his brother Buck down to go over the account, and told Buck not to have any dispute with him. He asked Lester Rushing the next day if he thought he would charge the sack of flour to him wrongfully. The deceased did not answer yes or no. The defendant tried to explain to him where he got the flour and molasses. Deceased then remembered the molasses, but denied the flour. Defendant insisted that he got the flour, when deceased drew a pair of knucks and followed the defendant to his house, cursing him and calling him a son of a bitch. He followed him to his door with his knucks, when defendant went into *Page 541 
his house and got his gun. Deceased then left, threatening to kill defendant. Defendant tried to make friends with him, and told deceased he would drop everything and never mention the sack of flour again. The deceased, after the dispute at the defendant's door, went over to his mother's and returned with a pistol. On Monday night previous to the homicide deceased tried to burn the home (646) of the defendant. The witness was lying in his room. He heard a match strike under this room; the light blazed up and could be seen through the cracks of his log house. Defendant ran out and saw Lester Rushing. The witness shot twice, and Lester ran down to his house and through his door. The deceased had set fire to some cotton and fodder under the room in which the cotton was stored. On the day of the homicide he had been moving Willie Simpson. He left home early that morning, and returned home about dusk that evening; found no one at home but his wife and children. He had had no dinner; he put up his mule and went in and asked for supper at once. He was eating supper, and heard some one shooting outdoors. He called his wife and asked who was shooting out about Lester's house. She never answered. He got up and went to see what was the matter and what had become of his wife. He saw his wife and children going down the hill and Tom and Lester coming up towards the barn. He picked up his gun before he stepped out of the door. When Tom and Lester reached the place where the road forks, one end going to the barn and the other end to Jesse's house, they turned up the path into Jesse's yard. They had a gun with them. Defendant told them not to come up there raising any fuss. Robert Price came up about that time and said: "Boys, this won't do." Lester and Tom did not say anything; Lester pulled out his pistol and fired at the defendant. Tom was carrying a gun. Defendant was standing at the corner of his porch. When Lester fired, defendant shot up over them. Deceased and Tom kept coming towards the defendant, continuing to shoot. Defendant thought they were going to kill him and ran around the house. Defendant fired as he ran. He ran around the house and through his kitchen door on the back side. The door was latched and he broke the door open to get in. After he went in the house, he thought he heard Tom Rushing and the deceased in the yard. His mother ran over there and came to the front door. He whispered and told her that the deceased and Tom were trying to kill him. When she left, he ran out of the dining-room into the edge of the woods and ran over to his mother's house. His mother came very soon and told him that he had shot Lester. (647) He told her that he was sorry that he had shot him, but it looked like he was forced to do it; that they ran on him. Defendant then went *Page 542 
immediately to Mr. Morgan, a justice of the peace, and surrendered. This defendant further testified that, before the day of the homicide, he had been told by several persons, whose names he gave, that Lester Rushing had threatened to kill him, and when he returned to his house on the evening of the homicide his wife told him that Lester had a Winchester rifle and was drunk; that she was alarmed and asked his brother Robert to come to their home and stay with them. There was evidence implicating Robert Price, and also evidence tending to show that he took no part in the affray, but had merely gone to his brother's house to prevent a difficulty, and as a peacemaker, and that he ran when the first shot was fired and did not return.
We have stated substantially so much of the evidence as is necessary to an understanding of the exceptions, following as nearly as possible the version of the defendants' counsel, as found in their brief. There was much testimony introduced by the State and the prisoners, tending to sustain their respective contentions. The defendants were convicted of murder in the second degree, and appealed from the judgment which was rendered upon the verdict.
We will consider the exceptions in the order of their statement in the record. The defendants proposed to ask the witness Thomas Rushing how many times the deceased had threatened to take the life of Jesse Price in his presence. The rule in regard to the admissibility of previous threats is stated in S. v. Turpin, 77 N.C. 473, and more recently in S. v. Exum, 138 N.C. 600, and S. v. Baldwin,155 N.C. 494. The general rule is that proof of the character and habits of the deceased, and of his disposition towards the prisoner, (648) is not relevant to the issue in trials for homicide, but there are certain well-settled and well-defined exceptions to this rule of exclusion, which are fully stated in the cases we have cited. At the time the question was asked in this case nothing had developed to bring the proposed evidence within any one of the exceptions, and, we may add, it did not appear that the threats had been communicated to the prisoner. The question was therefore, properly excluded, under S. v. Exum, supra, as the proof was not again tendered by the prisoner after the facts and nature of the case had been sufficiently shown to have made it competent. *Page 543 
The prisoner, Robert Price, was asked by his counsel if he went to his brother's house to make peace. Assuming that the question was otherwise competent, under S. v. Hall, 132 N.C. 1095, and S. v. White, 138 N.C. 704, it was leading, and properly excluded for that reason; but the witness had already testified that he went to the house, as a peacemaker, to prevent any difficulty between his brother and Lester Rushing.
Buck Price, brother of the prisoners, had testified as to a prior meeting between Lester Rushing and Jesse Price, when they quarreled about their settlement, and Lester Rushing cursed his brother and threatened to kill him. The State introduced a witness, John Smith, to contradict him, and was allowed to do so over the prisoner's objection. We do not see why this ruling was not a proper one. If it was material to know what had occurred at their meeting a few days before the homicide was committed, it was certainly relevant to show that the witness Buck Price had given two conflicting versions of the matter. This exception does not seem to be relied on by the prisoners' counsel in their brief, S. v. Register,133 N.C. 747, but we have considered it, nevertheless.
The prisoner, Robert Price, requested the court to charge the jury to return a verdict of acquittal as to him, there being no evidence of his guilt; but we are unable, after a careful examination of the case, to say that there is no evidence of his participation in the affray which led to the death of Lester Rushing. The witness Thomas Rushing testified: "I did not see either of the defendants before we were shot I did not hear them say anything at the time we were shot. I heard them shoot at Jesse's house before we went. I saw the (649) defendant Jesse shoot. I do not know how many shots he made. They shot so fast I could not count them. I didn't hear but one shot with the gun. Both went to shooting pistols, Robert and Jesse Price. I saw them both. They were standing right by the side of the wagon, between me and Lester. The wagon was sitting a little to the right of the house, between the barn and house. When they shot at us, I turned my head to see who it was. I came right down the road where Lester was. I left my brother in the cotton patch. He died at his house about three hours after he was shot. (Points out Jesse's and Robert's shots.) I could not tell how many times they shot at us. I have an idea that some eight or ten shots were fired. I did not pronounce but one to be a gunshot; the others pistol shots. Robert and Jesse Price both were shooting pistols, standing behind the wagon. Jesse shot the gun. I only shot one time after defendants shot at us. They were standing at the same place in front of the wagon when I *Page 544 
shot. They shot three times after I did. After I went to Lester's house, they fled."
It was not necessary to his conviction that the prisoner, Robert Price, should have had any previous understanding with his brother that they should together attack the Rushings, or that Robert Price should take part in the affray. If he actually engaged in the assault upon them, or was present aiding and abetting his brother in his unlawful acts, it would be sufficient to sustain a verdict against him, although his original motive in going to Jesse's house may have been a good one. He must be judged by what he did, and not merely by what he intended to do. There was, at least, some evidence of his guilt. It was for the jury to weight it and find therefrom the fact of guilt or innocence. The facts in this case are not like those in S. v. Tachanatah, 64 N.C. 614, and S. v. Howard, 112 N.C. 859. If it be true that the deceased and his brother were walking away from the prisoners, and the latter fired at them, and the shot struck them in the back, we do not see why this is not some proof of a joint participation in the felonious assault, especially when considered in connection with the other evidence (650) in the case. The court charged fully and correctly on this phase of the case.
The prisoners requested the court to submit certain special instructions to the jury, and the charge of the court will show that they were substantially given, and in some instances most favorably to them. The jury were fully cautioned as to how they should examine and weigh testimony of interested witnesses, and no objection to the charge, in this respect, is well founded.
The prisoners requested the court to charge the jury that, in considering the plea of self-defense, they should be guided by the facts and circumstances as they appeared to them at the time of the homicide, and if a man of ordinary firmness would reasonably have apprehended, under such circumstances, that he was about to suffer death or serious bodily harm, they should acquit the prisoner. A careful review of the charge satisfies us that the court fully responded to this request, and instructed the jury substantially in accordance with its terms. It is not required that the very language of a prayer should be used in giving the instructions asked for, but it is sufficient for the court to instruct the jury substantially as requested, in its own words — provided, if the party is entitled to the instruction, its force is not weakened or its meaning materially altered by any change in the language. It is true, the court told the jury that the prisoners must have killed in their necessary self-defense, but he explained to the jury what was meant by this expression in other parts of the charge, and substantially instructed *Page 545 
the jury, in language that could not well have been misunderstood, that if they had a reasonable apprehension, under the circumstances surrounding them, that they were about to suffer death or serious bodily harm, their act in slaying the deceased was excusable in law, and they should acquit the prisoners. The charge must be read and construed as a whole. S. v.Exum, supra; Kornegay v. R. R., 154 N.C. 389; S. v. Lewis, ibid., 632. When thus considered, it was a full and clear exposition of the law as applicable to the facts. This case bears no resemblance to S. v. Barrett,132 N.C. 1005, and S. v. Clark, 134 N.C. 699.
The prisoners further excepted to the charge because the court (651) failed to charge fully and explicitly upon manslaughter. The prisoners requested no instruction as to manslaughter, and we do not think the evidence warranted the submission of this question to the jury. If the prisoners' version of the facts was the correct one, they were not guilty, as they manifestly acted in self-defense, and the jury were so instructed; but if the State's contention was accepted by the jury (and it must have been), then they were guilty, at least, of murder in the second degree. The solicitor did not ask for a conviction of murder in the first degree, so that murder in the second degree was the highest grade of homicide for which they were being tried. As we have said, there is no suggestion of manslaughter in any of the prayers tendered in behalf of the prisoners, but without exception they conclude with the request for an instruction to the jury directing them to return a verdict of not guilty. The case was tried upon the theory of self-defense, and all the evidence tended to show that the prisoners were either guilty of murder or that the homicide was excusable. The court instructed the jury that if they found the facts as the prisoners claimed them to be, they should acquit the defendants. If the jury found the prisoners guilty, they should not return a verdict for manslaughter, without evidence to support it, merely because of an aversion to convict of the higher felony. Verdicts must be based upon the evidence, and not inspired solely by merciful considerations or feelings of sympathy. Jurors are not to be moved by motives of clemency, however commendable they may be, but should decide always according to the facts and the law. There was no view of the facts which called for an instruction as to manslaughter, and in this respect the case is not unlike S. v.White, 138 N.C. 704.
If the State's evidence is true, the deceased was shot in the back while he was walking away from the prisoners, unconscious of their presence, and when they were in no danger, real or apparent; while, if the prisoners' evidence be true, Robert Price fled immediately, and Jesse Price *Page 546 
also retreated, and fired the fatal shot while doing so. There is no element of manslaughter in these facts. The jury convicted the prisoners of murder in the second degree, we presume, because of the physical facts or natural evidence in the case, the testimony of Thomas Rushing (652) and the clothes which were exhibited showing that the Rushings had been shot in the back by some one in their rear, for doing which not even the violent threats of Lester Rushing excused them. Threats of the deceased and fear on the part of Jesse Price induced thereby did not, of themselves, justify the killing. There must have been some act of violence or some other circumstance to rebut the implied malice of the law and excuse or mitigate the offense.
Our consideration of the case has led us to the conclusion that no error was committed at the trial.
No error.
Cited: S. v. Tate, 161 N.C. 285; S. v. Vann, 162 N.C. 541; S. v.Blackwell, ib., 682; S. v. Ray, 166 N.C. 434; S. v. Powell, 168 N.C. 142.