Kinkead, J.
The defendant is indicted for murder in the first degree.
It is charged that defendant with deliberate and premeditated malice cast and threw his wife, Emma, upon the floor; that while so lying upon the floor, the defendant struck, beat and kicked her upon the head, stomach, back and sides; that he cast and *98 threw her to the floor by striking and beating her with both hands and feet. Her ¡body from her knees to her head was covered all over with bruises. Her face was bruised; there was a cut in her lip; there was a cut behind the ear. Blood was spattered on the walls of three rooms in the house; she was nude when found; hair was found around the rooms and on defendant’s clothes. Blood was found on defendant’s underclothes from his knees down. 'The kitchen floor and that of another room had been washed up; partly bloody clothes of the woman were found in a receptacle showing that they had had blood washed out .of them; the house was generally torn up disclosing that there had been a struggle between husband and wife. Defendant is colored and the wife white. He is strong and brawny, his face and evasive eyes tend to show a disposition easily stirred to anger, viciousness and brutality.
The homicide occurred after midnight on Saturday. He had gambled Saturday and having won some money, he indulged liberally in drink. He took his wife home from a saloon and returned continuing drinking until closing time, going to his home in a taxi. He met his wife; who had a guest with her keeping her company, in a very cordial manner. Both he and his wife were in good humor. The guest left .the house at about 1 A. M.
A neighbor about fifty feet away was awakened by hearing the wife scream. She later heard the husband call to his wife from the outside of the house. The witness got up from bed on hearing the first screams which awakened'her and went to the window. She went back to bed, and heard the wife scream again; she went to the window and saw the husband out in the yard and heard him say: "Come on out if you think I am drunk, by God.” She heard the wife answer that she could not come out because he had pretty near killed her; and heard the husband tell her if she did not come out — to get her clothes on and come out or he would come in and finish her.
This was about 2 o’clock a. m., the witness stated. 'The witness saw him go back in the house. After he went back in the *99 house she heard the wife scream once more, and heard nothing after that.
There were lights in the house which were extinguished not long after the husband went in the house; .it was after .the witness heard the last scream.
About 3 a. m. the defendant went to a nearby cement plant, woke up the night watchman and told him that some one had murdered his wife. Police officers were then called and to them and later at police station he continued to give the false account of the affair. Finally, however, he voluntarily confessed to the killing at the police station. He stated that he and his wife had some argument a day or two before, and he went home drunk and crazy and started an argument. He states that he must have started into an argument; that the killing was done through fighting, that he' was just crazy; that he did not know that he choked her; that whiskey was the cause of it; the only'reason for having done it, he says, was jealousy and being full of whiskey; that he would not have done it if he had not been drinking; that he thought more of his wife than he did of his own soul; that he did not plan it, because when he left her and went back up town Saturday night, he left her in a good humor.
In his testimony he states that after he returned home his wife accused him of having gone back to town to be with a woman, and called the woman a whore; he states that he pulled off one shoe and had taken off his top coat and sweater, and was reading the paper, when she went out of the door; that he dozed off to sleep;' when she came back she woke him up and said: “I was over there to see that bitch but I could not get in. I will see her in the morning”; that she pulled out a note, and asked him where he got it. 'Then he recites that he had gotten-a note through a little boy which he had put in his pocket, and had taken it out and left it at home, and that he supposes she had gotten it.
He states that he started to bed, and as near as he can remember he was sitting on the side of the bed and she says: “If you go to sleep here tonight I will cut your God damn *100 throat.” He says that she got the razor out of the drawer or out of the pitcher, and in the scuffle with her getting the razor out of her hand he cut his hand. He indicated a scratch on his arm. He states that he thought he threw the razor on the side of the bed and then sat on the side of the bed and talked, and they kept ' ‘ fussing, ’ ’ when he claims to have finally stated: “Well, I will go away if we have to argue all night; I will go some place and stay until morning and maybe you will feel better in the morning. ’ ’
He then states that he put on his shoe, that the lamp was on the center table or wash stand, that she threw the lamp over; that it struck him, aúd flew on papers which caught fire; he stepped into the kitchen, got a dish of water and threw it in the house on her and the paper; that he got a bucket of water and threw it on the paper and put the fire out.
He claims to have stood there a second or two' — that he supposes she went and pulled her clothes off — he was in the bed room — thinks he went to get water — came baek — told her he was going out — told her he would go to Mr. N.-, a friend, started to go — when he started to go out the door she was undressed — pulled all her clothes off — she said: “If you go out that door tonight I will blow your God damn brains out”; he was going out of the bed room — when he started to go out the door, his wife got the pistol out of the drawer and when she threw the pistol up he knocked it down — he supposes because it did not hit him it must have went off in the floor or somewhere in the room — and the fight, he says, started right there— and that is about as much as he can remember.
He states the razor was lying on the floor, and was picked up 'by Donaldson, police officer.
On cross-examination he admits his wife had not touched him. When asked who started the fight he answered that he supposes she must have done so. He stated that she took off her clothes when he threw the water on her. He said nothing about the alleged razor or revolver incident in his statement at the police station. He did not state at police station that his wife *101 started an argument, but on the contrary said he was drinking— was crazy — -and started an argument.
In response to a question by the court, whether he kicked his wife — he stated: “I don’t remember using anything — whatever I used, but suppose I must have used my hands and feet as much as I can remember.” “As I said as has been explained to me since I have been arrested and all, it looks as though I must have kicked her and used my hands.”
In his admissions at the police station he stated that he had beaten his wife before but that he had gone too far. •
Before the coroner, defendant said he was sorry — didn’t mean to do it. Said he had given her more that she could stand' — • that he had beaten her before.
The revolver was found by the officers in the dresser drawer; drawer was closed. Examinations of the revolver disclosed it had not been used; the razor was found in the dresser.
If defendant’s wife had used the razor and the revolver as claimed by him and if either was lying on the floor, it is unlikely that defendant would have put either back in the dresser drawer.
The finding from the evidence is that defendant killed his wife without any provocation, by beating and kicking her. His claim that she made an attack upon him with a razor or revolver is not worthy of belief and is not consistent with his own admissions and the facts and circumstances disclosed by the evidence.
The body was covered with a mass of bruises from head to foot — one solid mass of bruises; the left kidney was torn loose from its fastenings, the ribs were fractured, one or both lungs were punctured.
Death was due to internal hemorrhage due to external violence. The primary cause was the fact of the artery of the left kidney being torn — -being torn from the kidney and the ribs puncturing — the broken ribs puncturing the lungs.
The secondary cause of the death was hemorrhage. The wounds were necessarily fatal. It required a very severe blow to loosen the kidney.
*102 Some question is raised whether on ’conviction by confession in open court in a capital case the defendant may be permitted to claim self-defense. In this case it is claimed that the wife attacked the accused first with a razor, then with a revolver, she having fired the same, and that this started the fight.
Such evidence may be considered as presenting a claim of self-defense, as well as of provocation, reducing the grade to manslaughter.
'Without regard to the verity of the testimony, which comes solely, from the prisoner, some consideration is given to the question because of its novelty and importance.
A further question arises whether in considering ,the evidence and arriving at a conclusion concerning the degree of the crime, the reasonable doubt rule of evidence should apply and inure to the benefit of the defendant.
“By a plea of not guilty (the defendant) denies and puts in issue every material fact alleged in the indictment, thus imposing upon (the prosecutor) the state the burden of proving them.” Craig v. State, 49 O. S., 417.
A plea of guilty to an indictment for murder in the first degree is in its nature a judicial confession of the truth of both deliberation and premeditation as well as all other allegations in the indictment. It is an admission of every material fact well pleaded in the indictment.
The provision forbidding the extreme sentence for the capital crime, and making it the duty of the court to hear witnesses and determine the degree of the offense is a humane provision for the benefit of the accused, to insure the pronouncement of the sentence according to law regardless of the plea of guilty.
It is mandatory that “the court shall examine the witnesses, and determine the degree of the crime, and pronounce sentence accordingly” when the accused is “convicted by confession in open court.”
There is no guide in the statute whether or not the same rules of trial shall apply.
*103 To examine the witnesses and determine the degree of the crime requires the same consideration of evidence and law as if the facts were to be determined by a jury. This necessitates the application of the reasonable doubt rule.
A plea of self-defense, however, is inconsistent with a plea of guilty.
The court being of the opinion that the testimony of the prisoner concerning the alleged attack by his wife with a razor or revolver is unworthy of belief, disposes of any suggestion of self-defense.
Of what degree of homicide is defendant guilty!
Murder in the first degree consists in purposely taking a human life with deliberate and premeditated malice, or while, and maliciously, without deliberation and premeditation. Code, Section 12400.
Murder in the second degree is the taking of life purposely and malciously, with deliberation and premeditation. Code, Section 12403. Intent to maliciously kill must be shown.
Manslaughter is the unlawful killing of another, either upon a sudden quarrel, or while in the commission of an unlawful act. Code, Section 12044; Johnson v. State, 66 O. S., 59.
Malice is the essence of murder in the first and second degree, may be present in manslaughter, but is not an essential. Cline v. State, 43 O. S., 332; Erwin v. State, 29 O. S., 186; Nichols v. State, 8 O. S., 435.
In first degree murder malice must be express, while in second degree it must be implied.
In first degree homicide express malice may be indicated by facts and circumstances which show a deliberately formed purpose to take life.
In second degree murder implied malice may be shown by cruel acts, inhuman and atrocious conduct indicating a reckless disregard of human life though unaccompanied with a deliberate design to take life.
Express malice in first degree murder is descriptive of the state of mind and intent of the slayer, implying an act of his *104 will, intention or design to do the act (12 0., 483). The killing of a person with a sedate, deliberate mind, and formed design, is the result of express, deliberate and premeditated malice.
If the design or intention to take life be but the conception of a moment, it is sufficient if the slayer had time for thought for a moment, did intend to kill, the killing must be considered to be both deliberate and premeditated.
Implied malice, the essential characteristic of second degree murder, indicative of the mind- and intent of the slayer, is merely an inference or conclusion of fact and law from the facts and circumstances proved. It does not involve a formed purpose or design.
Where the killing is without design and premeditation, but is under the influence or is prompted by a wicked and depraved mind, or is with a cruel and wicked indifference to human life, or is the result of atrocious acts of cruelty, the law implies malice, and makes the offense murder in the second degree.
Malice is implied by law from every unlawful and cruel act however suddenly committed; the law contemplates that one doing an unlawful and cruel act voluntarily does it maliciously. If death ensues from an unlawful and cruel act of the slayer, without adequate or sufficient provocation, the law implies that such act was done maliciously, and the crime is murder in the second degree.
Manslaughter is where a person unlawfully kills another without thought or intent to kill, and without malice.
If one in a sudden affray, in the heat of blood, or in a transport of passion, inflicts a mortal wound, without time for reflection, or for the passions to cool, with adequate provocation, it is manslaughter.
Manslaughter results not from a wicked and depraved spirit, or malice aforethought, but from provocation to kill — so great as to produce a transport of passion which for the time being renders the person deaf to the voice of reason.
With these fundamentals of the grades in mind the task of deciding the degree-of defendant’s guilt is undertaken.
*105 Before considering the effect of the threat made by the prisoner while ont in the yard, attention will be given the character and nature of the mortal blow, and the legal effect to be given the same.
The acts of defendant in beating his wife with his fists and in kicking her, drawing the inference from the mass of bruises all over her body, justifies the conclusion that she was beaten in a most unusual, cruel, inhuman and atrocious manner.
The deliberate selection and use of a deadly weapon in a manner purposely calculated to cause death is a circumstance which indicates in the mind of the person committing the act a purpose or design to kill, because the person knows it will cause death. This is an inference which a jury majr draw in a proper case.
It is as reasonable to apply the same rule of reason to such brutal and atrocious conduct of beating and kicking as is disclosed by the evidence in this case, showing as it does such severe injury to the body resulting in death. From such acts and conduct a jury in a proper ease might be justified in drawing the inference of intent to kill. In at least one state killing by brutal and atrocious acts is raised by specific statute to first degree homicide.
In our state, however, the inference of intent-to kill and of implied malice which may be drawn from the use of a deadly weapon, without further proof of threats or other acts, is insufficient to show premeditated malice and raise the grade to first degree.
The conclusion is reached in this case that it is a sound rule of law to draw the inference of purpose to kill and implied malice from the extraordinary cruel, brutal and atrocious acts of the slayer in beating his wife to a degree evidently dangerous, and in such manner as to sever the kidney from the arteries, and to pierce the lung with broken ribs, resulting in hemorrhage and death. An appropriate instruction should be given in a trial by jury, and in this case the court draws the inference of fact that the defendant intended to maliciously kill the deceased.
We have found some helpful decisions and authority bearing on this point.
*106 Bishop states:
“Whenever a person in cool blood beats another in such a manner that he afterwards dies thereby, he is guilty of murder, however unwilling He might have been to have gone so far. If the beating, however wrongful, was neither with a deadly weapon, not carried to a degree evidently dangerous, and there was no intent to kill, but unfortunately death followed, the offense would be only manslaughter.” Bishop Gr. L., Section —.
In State v. Jarrott, 1 Iredell (S. C.), 76 (1840), it was considered that if homicide be committed under such circumstances of cruelty as manifest the thoroughly wicked heart, and the facts from which it is to be inferred all distinctly appear, cruelty then becomes an inference of law.
This is the rule applicable to the use of a deadly weapon, which the court considers may be appropriately extended to the present case for the reason that the circumstances of cruelty on the part of defendant clearly manifest a thoroughly wicked, malicious and depraved mind fatally bent on destruction of life.
An interesting case, similar to the one under consideration, is Pennsylvania v. Lewis, Addison’s Reports (Pa.), 278.
‘ ‘ The accused defendants — several of them — stuck together at a wedding party dance, and pushed W., 73 years old, against the wall, threw him down and fell on him, from which acts death resulted. Declarations by W. between the blows and his death that certain of the accused kicked him,, that his inside was battered to a jelly by the accused.
“If W.’s death was caused by the violence of the accused, done with intent to kill, it is murder in the first degree; if merely with intent to hurt, and tending to bloodshed or death, murder in the second degree.
“The accused desisted upon complaint of W. and then repeated the conduct, throwing W. several times to the floor, and once all of the accused falling on him. They pushed W. and wife off of chairs, threw stones into house, threw him down off his porch and kicked him. They continued, there all night and part of next day. There were marks of bruises on one side and thigh.”
PI eld: “If the death was occasioned by the violent acts of the prisoners, and if those acts were done with a design to kill, it is *107 murder in the first degree, and if done without a design to kill, if with design to hurt, and tending to bloodshed or death, it is murder in the second degree; if without such intention it is manslaughter. ’ ’
It is not the character of the weapon used that determines the degree. The means with which the offense was committed is not a constituent element of the crime of murder. If all the ingredients of the crime exist it is murder, no matter with what means or instrument the killing was done. 'Thus a murder maybe committed by a blow with a fist. Michie on Homicide, p. 105, Section 16.
Murder in the second degree exists where the circumstances show that homicide was committed under the influence of a wicked and depraved heart, and with a cruel and reckless indifference to human life and without express malice. Michie on Homicide, p. 155.
State v. Hall, 132 N. C., 1094 (1903):
“And the common law does not distinguish, as our statute does, between an absolute purpose to kill and the purpose to do a grievous injury to the person; so that, if the accused assault his neighbor, intending to beat him severely, and destroys his victim, though that was not his intention, he commits murder as much as if he ran him through with a sword. Roscoe Cr. Ev., 709. The use of a deadly weapon calculated to produce great bodily harm is enough at common law; and if the blow is struclc maliciously, and not incautiously, it is murder. So it is murder at common law if one kills another by throwing a stone into a crowd, or riding a kicking horse through a crowd of people.’’
Commonwealth v. Devlin, 126 Mass., 253, 255 (1879):
“Indictment charges that the murder was caused by the defendant by beating, stamping and jumping upon her person, and kicking her upon vital portions of her prostrate body, and that these acts were repeated at intervals during the day, by reason of which she suffered prolonged agony before death.
"The statutes of Massachusetts define murder in two degrees. It is provided that when the killing is ‘committed with extreme atrocity or cruelty’ the crime is murder in the first degree.”
*108 Opinion, Colt, J.:
' ‘ The crime. of murder always implies atrocity and cruelty in the guilty party; but there are degrees of criminality in that respect, even in the felonious and malicious taking of human life; and, in order to justify a finding of murder in the first degree, it requires that something more than the ordinary incidents of the crime shall exist — something implying more than ordinary criminality, and manifesting a degree of atrocity or cruelty which must be considered as peculiar and extreme. The nature of the question is such that it must be largely left to the determination of the jury; and when there is sufficient evidence to justify it, their findings must be conclusive.
* • * # * # m
“There can be no doubt that this presents a case of savage unfeeling, and long continued brutality of purpose, which fully justified the jury in finding the defendant guilty of extreme atrocity and cruelty. * * * It is enough if the means used were extreme as compared with ordinary means of producing death. ’ ’
State v. Stitt, 146 N. C., 642 (1908):
“To constitute murder an unlawful and intentional taking of another’s life must be shown, by killing with a deadly weapon, or under circumstances tvhich indicate a reichless indifference to human life.”
State v. John, 172 Mo., 220 (1902):
“Defendant was a dog catcher. He was in the act of catching a dog which attracted a number of persons. Some boys began barking like a dog, jeering the defendant. Defendant became incensed at boys and threatened to kill some of the crowd, and singled Richter, and without warning struck a blow upon the jaw with his fist, felling him to the sidewalk. Eight days later Richter died from the wounds.
“Defendant testified that Richter tripped him; that 'he stuck but his foot and I fell,’ A strong brawny man will not be allowed to approach an unoffending citizen in a public highway and deal him a deadly blow with his fist in a vital part and when death, the natural consequence of his act, ensues, be heard to say that he merely intended to punish him and not to kill *109 him. The facts in this case disclose unmitigated brutality— conduct much in keeping with the business in which defendant was engaged.”
Defendant found guilty of murder in second degree. It was not a ease of mutual combat.
"A strong brawny man will not be allowed to deal a deadly blow with his fist in a vital part, and when death, the natural consequence of his act, ensues, be heard to say that he merely intended to punish him and not to kill him.” State v. John, 172 Mo., 22, Am. St., 513.
"It is as much murder to kill a man with his fist under circumstances of unmitigated 'brutality as to shoot him with a loaded revolver.” State v. Hyland, 144 Mo., 302.
"A person who has killed another without meaning'to kill him is guilty of murder or manslaughter, the nature and extent of the injury or‘wrong which was actually intended most controlling importance.
"This has always been the doctrine of the common law.” Weller v. People, 30 Mich., 16.
Nature of the act:
"And in general,” Blackstone stated, "where an involuntary killing happens in consequence of an unlawful act, it will be either murder or mcmslaughter according to thé nature of the act which occasioned it. If it be in the prosecution of a felonious intent, or in its consequences naturally tended to bloodshed, it will be murder; but if no more was intended than a mere civil trespass, it will amount only to manslaughter.”
The conception is that malice in law or implied malice does not consist of a formed design to kill. It is unlike a purpose to kill formed and thought over. To be guilty of purposely and maliciously, taking life, it is not essential to have formed a design to bill. It is sufficient if the design was to strike, beat or kick another without formed intent to kill, and in striking kills, that is murder. All that is necessary is that the slayer *110 should have conceived the design to commit an assault, and in perpetration of such act, the person dies. That is murder in the act of assault and beating is of a brutal and atrocious character. A formed design is not essential in such kind of murder
See State v. Alexander, 30 S. C., 74, 14 Am. St., 879. Mayes v. People, 106 Ill., 306; 46 Am. Rep., 698:
“It appeared that a husband, angry and drunken, without provocation threw a beer glass at his wife, which struck a lamp she was carrying, breaking it and causing it to fatally burn her.
“It was held immaterial whom he intended to strike, or whether he had any specific intent, but that the act showed an abandoned and malignant heart, and malice was implied.”
See Griffen v. State, 40 Tex. Cr., 312; 75 Am. St., 718, where there was provocation.
Clark v. State, 117 Ala., 1; 67 Am. St., 157:
“A husband beat his wife while she was quick with child, inflicting injuries from which it died after it was 'born.
“There being no evidence of express malice or of an intent to take life, the injury consisting of beating the mother unlawfully, and in a manner dangerous to life, malice in such case is to be implied as distinguished from murder in the second degree. ’ ’
“Held: An instruction for manslaughter should not be given, as the offense was murder in the second degree.”
“If the act which produced death be attended with such circumstances as indicate a wicked, depraved and malignant spirit, the law will imply malice, without reference to what was passing in the prisoner’s mind at the time.” State v. Levelle, 34 S. C., 120; 27 Am. St., 799, note.
The foregoing authorities disclose the rule of distinction between an ordinary assault with fist or feet, and one which shows depravity of nature and cruel and reckless indifference to human life — between simple assault and one attended with more than ordinary criminality, manifesting a degree of atrocity or *111 cruelty peculiar and extreme — a case such as the facts and circumstances of this case disclose, of savage and long-continued brutality of purpose — of unmitigated brutality.
Defendant can not 'be guilty of manslaughter because the court does not find cause of provocation reducing the crime to that grade. Even an ordinary provocation given by a woman to man of more than ordinary strength, even though it be a blow, will not lower the homicide to manslaughter. Where a blow is cruel and atrocious, provocation will not excuse it. Com. v. Mosler, 4 Pa. St., 264.
Clearly defendant is guilty of murder in the second degree for the reason that the unusual atrocity and brutality of the acts of beating warrants the inference and conclusion of a purpose to maliciously kill.
And if the threat made by defendant that if his wife would not come out in the yard he would go back in and finish her is to be regarded as proof of deliberate and premeditated malice, and it is clear that thereafter the mortal blow was struck, the crime is to be held as first degree murder.
The witness, Mrs. Edna Smith, heard the wife scream two or three times between one and two o’clock, which awakened her. She got up and went to the window to see who it was. She went back to bed again, then heard her scream again. Mrs. Smith looked out .and saw defendant out in the yard and heard him say: “Come on out if you think I am drunk, by God.” She heard the wife of defendant answer that she couldn’t come out because he had pretty nearly killed her. Then she heard defendant say “if she did not come out — to get her clothes on and come out or he would come in and finish her.” Immediately after saying this he “went right straight in the house.”
After seeing defendant go back into the house, the witness heard the wife scream once, and then did not hear anything more. When the witness heard the above statements the lights were lit in the Kingcade house, and very shortly after hearing the last scream they were extinguished.
To state that he would go in and finish her evinced a purpose to kill and that he deliberated upon it. The scream by his wife *112 'immediately upon his going into the house disclosed that he struck or beat her. Whether at that time he struck the blows that resulted in puncturing the lung and which tore the left kidney loose from its fastening, which resulted in hemorrhage and death, must depend upon inference. The fact that the wife screamed only once after defendant returned to the' house and that the lights were extinguished would tend to show that the blow or blows then struck by defendant were the cause of death.
She was able to talk to him when he was out in' the yard and it may be that she would have lived if he had not further injured her after-returning to the house.
It is not reasonably certain that the mortal blow was given after the threat was made to finish her. No evidence has been offered to show how soon life would be extinguished by reason of the hemorrhage of the lung, and from the loosening of the fastenings of the kidney.
Medical authority discloses that one may live some little time after the occurrence of either or both- of such hemorrhages. 'There is also authority for the theory that death may result from shock.
It seems entirely proper to apply the reasonable doubt rule in the solution of this question. There being, therefore,-a reasonable doubt whether death resulted from the acts of defendant subsequent to his threat, or from acts prior thereto, the finding of the court is that the defendant is guilty of murder iu' the second degree.